**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

MAXANNA SCOTT,

               **Plaintiff,**               **CIVIL ACTION FILE**

  **v.**                                 **NO. 1:02-CV-1950-AJB**

OTS INC., *doing business as*
*Omnitech Solutions Inc*.,
OMNITECH SOLUTIONS INC.,
and CHARLTON CARLOS
LESTER,

               **Defendants.**

## OPINION AND ORDER[1]

In this civil action, Plaintiff contended, among other things, that Defendants owed

her additional compensation for overtime hours pursuant to the Fair Labor Standards

Act, 29 U.S.C. § 201*, et seq.,* ("FLSA" or "the Act").  The Court conducted  a bench

trial[2] from September 21 to September 23, 2005.  Based on the evidence, the arguments

of the parties and application of the law, the Court made preliminary findings at the

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [Docs. 85-86]. Therefore, this Order constitutes a final order of the court.

[2]     The parties waived a jury trial and agreed to a bench trial at the pretrial conference.  [Docs. 88-89].

conclusion of the trial.   Neither party has ordered the transcript.   The Court hereby memorializes its findings of fact and conclusions of law:

*Findings of Fact*

1.   Defendant OTS, Inc., d/b/a OmniTech Solutions, Inc. ("OTS"), is a computer training school.

2.   Defendant Charlton Carlos Lester ("Lester") was OTS's sole owner and president.

3.   In February 2001, Plaintiff Maxanna Scott ("Scott") began working as a temporary receptionist for OTS through an employment agency.

4.   In that position, she answered the telephones, made copies  and "[ran] the front office."

5.   She was paid on an hourly rate through the temporary agency.

6.   In April, 2001, after not working at OTS for a month or so, she returned to OTS as a direct permanent employee of OTS.

7.   Her responsibilities were largely the same as when she was a temporary employee: filing, copying, answering the telephones and passing messages along, and making packages for students that the counselors handed out.

2

8.  She also entered information (student names, dates of birth, and social security numbers) into one or more databases, gave voucher numbers to students in order that the students could log onto the computer system to take examinations, and after the examinations were graded automatically via computer, advised the students whether they passed or failed.

9.  Scott worked on Saturdays and Sundays if students needed to take examinations. Lester described her role on these days as a "supervisor." She split these duties with Ken Norris.

10. On occasion, when there was a dispute as to whether a student had paid for a voucher, Scott would contact Lester for instructions.

11. Lester and others, but not Scott, monitored these exams. There is no clear evidence of Scott's monitoring of the test-taking itself in the absence of Lester or others.

12. Her hours were recorded by the company time clock.

13. Around September 1, 2001, Scott's job duties changed to the extent that she started doing bookkeeping work in addition to her other duties.

14. In connection with her bookkeeping duties, Scott reviewed the bills and printed checks to pay them. Scott did not sign the checks. Cindy Jolly, OTS's Director

3

of Admissions and supervisor over the office staff, checked them for accuracy. The record is not clear if Jolly in addition to Lester could sign checks.

15. Scott also ordered office supplies, usually on-line.  Jolly or Lester approved the purchases in advance.

16. Although Scott had a company credit card at some point, the Court finds that any proper use of the card was done only with the approval of her superiors.

17. Scott also did "cold calling" in the evening to potential students, and on a number of weekends, helped at open house functions at the school.  This latter task included handing out promotional material to potential students and signing up potential enrollees for appointments to speak with enrollment counselors.  She also ordered food or refreshments for these gatherings.

18. Scott's contact with  prospective students initially was governed by a script that she was provided.  When she learned the script, she did not rely on it any longer.

19. When Scott began her employment with OTS, there were four administrative personnel, including Scott, and five instructors.

20. As of August 2001, Plaintiff was earning $12.00 per hour.

4

21.    Beginning around September 2, 2001, Scott became a salaried employee, as opposed to an hourly employee, receiving a net pay of $1,384.62 every two weeks.

22.    Lester told her that she became a salaried employee due to the long hours she was working.

23.    Melanie Cason was OTS's Associate Director from February 2002 to February 2003.

24.    One of Cason's first tasks was to develop personnel records and job descriptions for OTS staff.

25.    Based on her knowledge of wage and hour laws, Cason concluded after considering Scott's duties that Scott was a non-exempt employee under the Act, primarily because Scott had no decision making authority, directed no employees and did not supervise anyone at OTS.

26.    Cason advised Lester of her opinion, who replied that he switched Scott to salaried status because he was paying her a lot of overtime.

27.    Although there was evidence that Scott benefitted from the switch to salaried employee because it allowed her to have more flexible hours, the Court finds that

5

the primary motivation behind the change was to reduce OTS's overtime commitment to Scott.

28.   Cason created job descriptions for OTS staff from a form that she used at one of her previous employers.

29.   She interviewed Scott and Lester and then prepared a job description for Scott demonstrating Scott's non-exempt status.

30.   Lester filled out a form (Plaintiff's Exhibit 40) and a job description (Plaintiff's Exhibit 41) that showed Scott as an Administrative Assistant.

31.   Cason did not prepare Plaintiff's Exhibit 41, and this description was not signed by Scott.

32.   Instead, Cason had prepared a job description for Scott entitled "Accounting Assistant," which contained Scott's signature.  Defendant's Exhibit 142.

33.   Scott was terminated from OTS in June 2002.  The reason given was "lack of work."[3]

---

[3]      Plaintiff's complaint also sought damages under Title VII and state law for sexual harassment.  Prior to the parties' consent to the undersigned's jurisdiction, the District Court entered summary judgment against Plaintiff on those claims.  [Doc. 68].

34.   Although Plaintiff's Exhibit 40 was created in the late summer of 2002, Lester back-dated it to September 2001.

35.   Lester's explanation that the September 2001 date evidenced only the effective date of her change in status was contradicted by the fact that the document included a place for identifying the effective date of the change, which was left blank.

36.   In addition, Lester showed Plaintiff's Exhibit 41 to Cason after Scott already had been terminated from OTS and had complained, among other things, about OTS's failure to pay her overtime.

37.   Although there was evidence that Cason had a motive to shade her testimony because of being a disgruntled former employee, the Court finds her testimony credible and accepts it as true since it was corroborated by the documentation and she appeared to testify truthfully.

38.   Lester's explanation for the status change and what he did to insure that it was legitimate and in compliance with the law, particularly his reliance on counsel's advice, simply is not credible nor supported by the other facts in the record.

39.   Scott did not supervise Herman Robinson, Lester's teenage nephew who sometimes came to OTS to work on the computers.  The evidence demonstrates

7

that when Plaintiff notified one of her superiors that there was a computer problem, she was instructed to call Robinson. His presence at OTS was occasional and sporadic, at best.

40. No time records were produced by Defendant for pay periods ending September 16, 2001, September 30, 2001, October 14, 2001, and October 28, 2001.

41. Plaintiff claimed overtime owed according to the following chart:

| Plaintiff's Exh. No. | Period Ending | Rate | Hours (2 wks.) | How Paid | Overtime owed (in $) (Time + ½) ($25.96/hr.) |
|---|---|---|---|---|---|
| 15 | 08/19/01 | $12/hr. | 110.75 | hourly | Paid |
| 16 | 09/02/01 | $12/hr. | 101.25 | hourly | Paid |
| ---------------------------------------------------------------------------------------------------- | | | | | |
| 18 | 09/16/01 | $1,384.62 (2 weeks) ($17.31/hr.) | no records [109.25] | salaried | 759.03 |
| 19 | 09/30/01 | $1,384.62 (2 weeks) ($17.31/hr.) | no records [109.25] | salaried | 759.03 |
| 20 | 10/14/01 | $1,384.62 (2 weeks) ($17.31/hr.) | no records [109.25] | salaried | 759.03 |
| 21 | 10/28/01 | $1,384.62 (2 weeks) ($17.31/hr.) | no records [109.25] | salaried | 759.03 |

8

-------------------------------------------------------------------------------

| 22 | 11/11/01 | $1,384.62 (2 weeks) | vacation | salaried | 0.00 |
|----|----------|---------------------|----------|----------|------|
| 23 | 11/25/01 | $1,384.62 (2 weeks) | 108.00 | salaried | 493.05 |
| 24 | 12/09/01 | $1,384.62 (2 weeks) | 117.00 | salaried | 960.15 |
| 26 | 12/23/01 | $1,384.62 (2 weeks) | 112.30 | salaried | 838.18 |
| 27 | 01/06/02 | $1,384.62 (2 weeks) | 81.15 | salaried | 29.84 |
| 28 | 01/20/02 | $1,384.62 (2 weeks) | 55.30 | salaried | 0.00 |
| 29 | 02/03/02 | $1,384.62 (2 weeks) | 99.45 | salaried | 504.72 |
| 30 | 02/17/02 | $1,384.62 (2 weeks) | 90.15 | salaried | 493.05 |
| 31 | 03/03/02 | $1,384.62 (2 weeks) | 44.3 (1st wk.) | salaried | 111.65 |

42.     Plaintiff testified that during the period without records, she worked: Mondays from 9:00 a.m. to 7:45 p.m.; Tuesdays from 9:00 a.m. to 10:30 p.m., when she closed the school and set the alarm; Wednesdays from 9:00 a.m. to 6:30 or 7:00 p.m., when she did "cold calling"; Thursdays, from 9:00 a.m. to 10:30 p.m., when she closed the school again; and Fridays, from 9:00 a.m. to around 5:00 p.m., because there were no classes.  She also testified that she worked one

9

Saturday a month from 11:00 a.m. to 5:00 p.m. and every Sunday, at first from 1:00 p.m. to 5:00 p.m. and then from 12:00 p.m. to 5:00 p.m.

43.   Plaintiff's testimony about the hours she actually worked was not completely credible.  It was inconsistent with the allegations in her complaint.  In regard to her testimony about taking lunch breaks and their duration she testified definitively on direct examination but hesitatingly and evasively on cross-examination.  Her testimony about weekend work clearly was an estimation ("I would say . . .," "I can't pinpoint exact") with regard to the hours worked.  On cross-examination, she admitted that her work hours actually varied, so her definitive statements on direct examination as to what was her daily schedule thereby was undercut.  The Court expected that she would be able to testify with more certainty as to the hours that she worked between September 3 and October 28, 2001.

44.   Lester disputed Plaintiff's version of her Monday hours (although conceding that she probably stayed until 7:00 p.m.), as well as her Tuesday hours (disputing that she left at 10:30 p.m. due to the role of another employee, Wendell Brown).  He similarly disputed her contention that they worked every Sunday, but agreed that

AO 72A
(Rev.8/8
2)

OTS had an "open house" once a month.  However, Lester did not dispute Scott's Wednesday through Friday schedule.

45.    The Court finds that Plaintiff worked approximately 72.84 hours of overtime during the pay periods of September 16 through October 28, 2001.

46.    Scott was returned to hourly status in March 2002, based on Cason's wage and hour analysis.

*Conclusions of Law*

1.    *Statutory, regulatory and precedential framework*

      a.    *Fair Labor Standards Act*

The FLSA was enacted in 1938 in attempt to ameliorate substandard labor conditions throughout the nation.  *See* 29 U.S.C. § 202 (setting forth Congressional findings and declaration of policy); *Nicholson v. World Business Network, Inc.*, 105 F.3d 1361, 1353 (11th Cir. 1997).  Among its provisions are those requiring employers to compensate employees at a premium for work performed in excess of forty hours in a single week.  *See* 29 U.S.C. § 207(a).  Specifically, § 207(a) provides that "[e]xcept as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee

11

receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  In other words, employees protected by the FLSA are entitled to "time and a half" for all hours in excess of forty worked in a single week.

> b.   *Exempt vs. non-exempt employees*

Because the FLSA was conceived to combat worker exploitation, Congress crafted the Act so as to apply only to the ranks of the traditionally exploited, creating numerous exemptions for those deemed not in need of federal protection.  *See Evans v. Continental Motors Corp.*, 105 F. Supp. 784, 793 (D. Mich. 1952) (purpose of exemptions is to reserve Act's protections to workers, as distinguished from managers, superintendents, foremen, or bosses).  Thus, for example, section 13(a) of the FLSA provides that the Act's overtime provisions do not apply with respect to "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).

In accordance with express authority under the FLSA, see 29 U.S.C. § 213(a)(1), the Secretary of Labor has promulgated regulations to define the meaning and delimit the parameters of the executive, administrative, and professional employee exemptions.  *See* 29 C.F.R. §§ 541.1-.3.  Having been adopted pursuant to express legislative

12

authority, these definitional regulations carry the force of law and are binding on the courts. *Wirtz v. Keystone Readers Serv. Inc.*, 418 F.2d 249, 260 (5th Cir. 1969).[4]  In addition, the Secretary has set forth interpretative regulations dealing with the above exemptions, *see* 29 C.F.R. §§ 54.101-.315, which, though not binding on courts, are entitled to consideration and weight in appropriate circumstances. *Id.* at 257.

The definitional regulations set forth both a "short test" and a "long test" for determining whether an employee falls within the exemption, for an administrative employee. *See* 29 C.F.R. § 541.2 .  The less demanding "short test" is applicable if the employee in question earns a salary of at least $250 per week.  29 C.F.R. § 541.2(e)(2). The parties agree that during the entire relevant period Scott's earnings exceeded this threshold and that therefore the "short test" for the exemption applies.  Under this test, one is deemed to be an exempt administrative employee if (1) she is compensated on a "salary basis"; (2) her "primary duty" consists of the "performance of office or nonmanual work directly related to management policies or general business operations

---

[4]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

of [her] employer"; and (3) such duty "includes work requiring the exercise of discretion and independent judgment."  29 C.F.R. § 541.2.

In addition, the regulations describe in depth the meaning of the key terms in the test.  According to those regulations, "bookkeepers, secretaries, and clerks of various kinds" are "run-of-the-mine" employees who do not perform work directly related to management or business operations.  29 C.F.R. § 541.205(c)(1).  Employees who do perform work directly related to management or business operations include those engaged in "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control."   29 C.F.R. § 541.205(b).

At issue in this case is whether Scott fits into the "administrative exemption." The applicable regulation, 29 C.F.R. § 541.202, provides in relevant part:

(a) To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.  In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term "matters of significance" refers to the level of importance or consequence of the work performed.

(b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment

14

situation in which the question arises.  Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

(c) The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision.  However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.  The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.  The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. . . .

15

\* \* \* \*

(e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. See also § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work.  An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.  For example, a messenger who is entrusted with carrying large sums of money does not exercise discretion and independent judgment with respect to matters of significance even though serious consequences may flow from the employee's neglect.   Similarly, an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer.

29 C.F.R. § 541.202.

Moreover, in order to be exempt, the employee's "primary" duties must fall into the administrative exemption as described above.  As a rule of thumb, "primary" implies that over half the employee's work relates to management policies or general business operations.  29 C.F.R. § 541.103.  The regulations further define "primary duty" as follows:

AO 72A
(Rev.8/8
2)

(a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work.  The term "primary duty" means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.  Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700.

In light of the FLSA's broad remedial purposes, its exemptions are to be construed narrowly against the employer.  *Nicholson*, 105 F.3d at 1364 (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)); *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 805 (11th Cir. 1992); *Atlanta Prof'l Firefighters Union, Local 134 v. City of Atlanta,* 920 F.2d 800, 804 (11th Cir. 1991); *see also Mitchell v. Lublin,*

17

AO 72A
(Rev.8/8
2)

*McGaughy & Assoc.*, 358 U.S. 207, 211 (1959) (Act should be construed liberally in employee's favor).  The employer must prove applicability of an exemption by "clear and convincing evidence."  *Birdwell*, 970 F.2d at 805 (citing *Donovan v. United Video, Inc.*, 725 F.2d 577, 581 (10th Cir. 1984)).

> c.    *Fluctuating workweek*

The FLSA regulations provide for an alternative way to calculate the compensation of certain salaried employees, called the "fluctuating workweek method." *See* 29 C.F.R. § 778.114.  This method allows an employee whose hours fluctuate from week to week to be compensated at a fixed amount per week as straight-time pay irrespective of the number - - few or many - - of hours worked.  Payment for overtime hours under this method is one-half time the regular-rate instead of the one and one-half-time rate, on the premise that the straight-time rate already includes compensation for all hours worked.  The regular-rate of hourly compensation will vary from week to week depending on the number of actual hours worked in any given workweek; it is calculated by dividing the number of hours worked into the amount of the straight-time salary. *Davis v. Friendly Express, Inc.*, 2003 WL 21488682, *1 (11th Cir. Feb. 6, 2003).  "The mathematics of this payment structure means 'the more the employee works and the more overtime the employee logs, the less he or she is paid for each additional hour of

overtime.'" *Id.* (quoting *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1280 (4th Cir. 1996)).

Under 29 C.F.R. § 778.114, the fluctuating workweek method of calculating compensation is used only if (1) the employer and the employee clearly understand that the straight-salary covers whatever hours the employee is required to work; (2) the straight-salary is paid irrespective of whether the workweek is one in which a full schedule of hours are worked; (3) the straight-salary is sufficient to provide a pay-rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours worked is greatest; and (4) in addition to straight salary, the employee is paid for all hours in excess of the statutory maximum at a rate not less than one-half the regular rate of pay. *Id*; *Davis*, at *1. The clear and mutual understanding prong of § 778.114 "only requires employees to understand the essential feature of the fluctuating workweek plan - - that fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." *Griffin v. Wake County*, 142 F.3d 712, 716 (4th Cir. 1998).[5]

_____

[5]     *Griffin* was cited with approval in *Davis. See Davis*, 2003 WL 21488682 at *2.

AO 72A
(Rev.8/8
2)

d.      *Individual liability*

An individual may be held jointly liable with an entity for violations of the FLSA, since the Act defines "employer" to include any person acting directly or indirectly in the interest of an employer in relation to an employee.  29 U.S.C. § 203(d).  *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991) (corporate officer with operational control over the corporation was an "employer," jointly and severally liable with the corporation); *Donovan v. Grim Hotel Co.*, 747 F.2d 966 (5th Cir. 1984) (corporate founder who held purse strings, guided policies, and could authorize FLSA compliance was "employer"); *Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983) (individual with significant ownership interest and operational control over day to day aspects was "employer"); *see also Falk v. Brennan*, 414 U.S. 190, 195 (1973) (expansive definition of "employer" under FLSA considers the extent of one's managerial responsibilities and control of working terms and conditions).

e.      *Damages*

Any "employer who violates 29 U.S.C. § 207 shall be liable to the employee . . . in the amount of . . . [her] unpaid overtime compensation . . . and in an additional equal

20

amount as liquidated damages."  29 U.S.C. § 216(b); *bailey v. Gulf Coast Transp., Inc.*, 280 F.3d 1333, 1335 n.4 (11th Cir. 2002) (indicating that the "only remedies" under § 216(b) are unpaid overtime compensation and liquidated damages).

    f.    *Good faith*

The Court may award no liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260.  The determination of whether an employer acted in good faith and had reasonable grounds for believing its act or omission was not a violation of the FLSA has both a subjective and objective component."  *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1566 (11th Cir. 1991). Subjective good faith means the employer has an honest intention to ascertain what the FLSA requires and to act in accordance with it.  *Id.* Objective good faith means the employer had reasonable grounds for believing its conduct comported with the FLSA. *Id.*  "[G]ood faith requires some duty to investigate potential liability under FLSA." *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979).  "What constitutes good faith on the part of an employer and whether the employer had

21

reasonable grounds for believing that its act or omission was not a violation of the Act are mixed questions of fact and law. . . ." *Dybach*, 942 F.2d at 1566.

    2.    *Conclusions*

        a.    *Scott's status as an exempt employee under the FLSA.*

As noted, the burden is on Defendant to prove the exemption.  Applying the evidence presented to the applicable law and regulations, as set forth above, the Court finds that Scott's primary duties during the period in question did not require the exercise of discretion and independent judgment.  Instead, her job was more in the nature of a clerical or secretarial worker, recording and tabulating data and performing mechanical, repetitive, recurrent or routine work.

Defendants did not prove that Scott exercised discretion and independent judgment with regard to the bookkeeping function, including the payment of bills and the writing of checks.  As the Court views the evidence, Scott opened the mail, viewed the bills, and prepared the checks, but there was no credible evidence that she had the discretion in her job as to whether to pay the bill or what amounts to pay.

Another duty which Defendants rely upon to demonstrate that Plaintiff was an exempt employee deals with the vouchers and the supervision of the testing.  Again, the Court finds that Scott just applied the policy of the company.  The evidence was that

22

if the student did not have the money to pay for the voucher, then someone other than Scott ultimately was responsible or had to make the decision as to whether that student could or could not take the test.  Thus, Scott was just acting in a clerical nature when she handed out the vouchers and retrieved the test results from the computer to give to the student.  Moreover, that Scott was present on weekends to administer the tests does not alter the clerical/secretarial nature of her job.

Defendants likewise did not establish by clear and convincing evidence that Plaintiff's role in this activity was either beyond the clerical/secretarial role she played in the conducting of tests during the week, or that this activity constituted a primary duty.

Nor does the evidence demonstrate, convincingly or otherwise, that Plaintiff could use or did use the corporate credit card independently and in the exercise of her discretion.  The only specific evidence about the use of a credit card occurred when it was someone else's credit card, either Jolly's or that of another person.

Finally, the Court concludes that Plaintiff's relationship to Robinson was not supervisory.  The evidence that Plaintiff contacted Robinson to resolve computer problems does not demonstrate that a primary duty of her job involved the exercise of discretion or independent judgment.

23

AO 72A
(Rev.8/8
2)

Thus, the Court finds that Plaintiff was not an exempt employee under the FLSA.

b.      *Scott's overtime hours*

The Court must determine what were Plaintiff's hours, prior to determining what measure of overtime pay is owed to her.

Plaintiff argued that to determine her overtime hours for the pay period weeks ending September 16, 2001, through October 28, 2001, the Court should consider the four weeks immediately preceding her switch to salaried status and the few weeks after the new year in 2001 for which records exist.  While that is an attractive and easy solution, it is a neither a valid comparison or an accurate test to determine what hours she worked between September the 3, 2001, and October 28, 2001.  This is because Plaintiff testified that when she became salaried, her job duties changed and she started doing bookkeeping functions.  Therefore, the Court does not find that the hours that she worked as reflected Plaintiff's Exhibits 15 and 16, are an adequate guide to determine the hours she worked in the weeks that are reflected in Plaintiff's Exhibits 18 through 21.

As noted, Plaintiff's testimony was not entirely credible as to the hours she worked during those weeks in September and October 2001 for which there are no records.  However, the Court can give her version some weight because Lester

confirmed that her stated hours during part of the undocumented period were correct.

In such a situation, the Court is guided by decisions of the Supreme Court and the

Eleventh Circuit Court of Appeals:

> [Where] the employer's records are inaccurate or inadequate and
> the employee cannot offer convincing substitutes . . . an employee has
> carried out his burden if he proves that he has, in fact, performed work for
> which he was improperly compensated and if he produces sufficient
> evidence to show the amount and extent of that work as a matter of just
> and reasonable inference.  The burden then shifts to the employer to come
> forward with evidence of the precise amount of work performed or with
> evidence to negative the reasonableness of the inference to be drawn from
> the employee's evidence.  If the employer fails to produce such evidence,
> the court may then award damages to the employee even though the result
> be only approximate.

*Etienne v. Inter-County Security Corp.*, 173 F.3d 1372, 1375-76 (1999) (quoting

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 683-84 (1946)); *see also Donovan*

*v. New Floridian Hotel, Inc.*, 676 F.2d 468, 472-73 & n.7 (11th Cir. 1982) (court may

approximate hours).

In this case, Plaintiff testified as to her hours and the Defendants did not produce

evidence of the precise amount of time that she worked.  While Defendants' evidence

highlighted weaknesses and inconsistencies in Plaintiff's proof, they did not produce

any evidence tending to negate the reasonableness of the inferences to be drawn from

Plaintiff's evidence.  The inferences which the Court concludes can be drawn from

AO 72A
(Rev.8/8
2)

Plaintiff's evidence are that the hours that she worked as reflected in Plaintiff's Exhibits 22 through 31, are a better comparison than using Plaintiff's Exhibits 15 and 16, since she testified that her job duties changed after she became salaried.

In approximating Plaintiff's overtime hours, the Court finds that the evidence for the week ending December 9, 2001, Plaintiff's Exhibit 24, was an anomaly. The Court also finds that the evidence for the hours worked for the week ending January 20, 2002, as reflected in Plaintiff's Exhibit 28, also was an anomaly. The Court similarly does not count Plaintiff's Exhibit 31, because it covered just one week, nor the vacation weeks in Plaintiff's Exhibit 22.

The total hours worked in the rest of the weeks that Plaintiff was salaried totaled 491.05 hours (108.00 + 112.30 + 81.15 + 99.45 + 90.15), which averages to 49.105 hours per week and 9.105 hours of overtime per week.

Applying this average number to the time periods for which no time records exist (Plaintiff's Exhibits 18 through 21), Plaintiff would be expected to have worked approximately a total of 72.84 hours of overtime during the pay periods of September 16 through October 28, 2001.

26

The overtime hours between pay periods November 11, 2001, and March 3, 2002[6] totaled 132.35 (28 + 37 + 32.3 + 1.15 + 19.45 + 10.15 + 4.3).

    c.    *Time-and-a half vs. half-pay*

Having found the number of overtime hours as to which Plaintiff was not compensated, the next issue is whether those hours are computed at time and one-half, as argued by Plaintiff, or pursuant to the fluctuating workweek method, as argued by Defendant.[7]

Of the four factors required under 29 C.F.R. §778.114 and *Davis*, Scott testified that she knew she was getting  straight-salary regardless of the hours she worked.  The straight-salary was paid, based on Plaintiff's Exhibits 22 through 31, regardless of

---

[6]    After March 3, 2002, Plaintiff returned to hourly status.

[7]    Although some courts have stated that it is not clear which party has the burden of proof as to the applicability of the fluctuating workweek method, *see Teblum v. Eckerd Corp. of Fla., Inc.*, No. 2:03CV495FTM33DNF, 2006 WL 288932, at *4 (M.D. Fla. Feb. 7, 2006); the Eleventh Circuit, in the unpublished *Davis* decision, has followed the Fifth Circuit's placement of that burden on Plaintiff.  *Davis*, 2003 WL 21488682, at *3 (citing *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636 (5th Cir. 2001).  In *Sampson*, the court held that because the fluctuating workweek is neither a defense nor an exemption to the FLSA, the employee has the burden of proving that the method does not apply to his case.  *But see Burgess v. Catawba County*, 805 F. Supp. 341, 348 (W.D.N.C. 1992) (since the method is an exception to the normal rights of the employee, the employer bears the burden of proving that all the requirements for applying the method are present).

27

whether she worked a full workweek.  There similarly was no issue that her salary did

not cover the minimum wage rate, because even in the pay period she worked the most

hours (Plaintiff's Exhibit 24), the effective hourly rate was $11.83, while the minimum

hourly wage rate was $5.15.  *See* 29 U.S.C. § 206(a)(1).

The remaining question is how to apply the forth factor.  That is, is the half-rate

pay a condition of the mutual understanding between the parties or, having been found

to have violated the FLSA, can Defendants limit their liability to Plaintiff after-the-fact?


Defendant rely primarily upon two cases: *Yadav v. Coleman Oldsmobile, Inc.*,

538 F.2d 1206 (5th Cir. 1976), and *Zoltek v. Safelight Glass Corp.*, 884 F. Supp. 283

(N.D. Ill. 1995).  In *Yadav*, plaintiff was paid a salary of $1,000 per month and worked

an average fo 55 hours per week; she was entitled to recover for 100 weeks or 1500

hours of unpaid overtime compensation.  The court held that since Yadav understood

she was paid $1,000 every month regardless of the hours she worked, her regular rate

of pay was determined by the dividing the total wage by the hours actually worked in

28

each particular week, and applying the half-rate to those hours to come up with the appropriate overtime calculation.[8]  *Id.* at 1207-08 & n.2.

In *Zoltek*, during the disputed period of 2½ years, the plaintiff was improperly considered an exempt employee and was paid a salary.  During this time, there was no express agreement that (1) plaintiff would be compensated through a fluctuating workweek; (2) his salary was paid to compensate him for all the hours he worked; or (3) his salary was paid to compensate him for all hours worked on a straight-time basis. In fact plaintiff worked over 40 hours for many weeks, for which he received no additional compensation.   The court noted that he accepted his paychecks and continued his employment without complaint.   The court therefore found that he impliedly consented to payment at a fixed sum per week regardless of the hours worked, so he impliedly agreed to be compensated under the fluctuating workweek method.  Accordingly, the court held that he was entitled the 50% supplement under the fluctuating workweek, not time-and-a half.   *Id.* at 287-88.

---

[8]     The court recognized that the fluctuating workweek rule required a recalculation of Yadav's regular rate of pay each week, but that the averaging method employed in the court below was "the only practical [procedure] under the evidence." *Yadav*, 538 F.2d at 1207 n.1.

Plaintiff sees the applicable law differently.  She notes that the *Davis* decision implicitly, if not explicitly, requires that the mutual understanding necessary for the application of the fluctuating workweek method be that the employee accepts overtime compensation.  That is, in *Davis*, the employees were paid overtime at the rate of half-pay and sued for time-and-a half.[9]

Plaintiff also relies upon *Rainey v. American Forest and Paper Assoc.*, 26 F. Supp. 2d 82 (D.D.C. 1998).  In that case, the court analyzed whether it was necessary for the fluctuating workweek method of compensating overtime to be employed contemporaneously with the payment of the employee's salary, or whether it could be imposed as a remedial measure following a claimed violation of the FLSA:

> It is beyond dispute, to be sure, that plaintiff's hours fluctuated on a weekly basis, . . ., that she received the same salary regardless of the number of hours she worked during a particular week, . . ., and that her salary was sufficient to compensate her at a regular rate of more than the minimum hourly wage. . . .  It is also beyond dispute, however, that plaintiff did not receive any overtime compensation - - aside from during a two-week period - - after she was reclassified as exempt from the Act in November 1995; defendant, in fact, concedes this point in at least three

---

[9]    Plaintiff also relies on *Spires v. Ben Hill County*, 745 F. Supp. 690, 704-05 (M.D. Ga. 1990).  However, the Court interprets the primary reason for the disallowance of the fluctuating workweek in that case to be that there was no clear mutual understanding that the salary paid covered all hours worked, however long or short.

AO 72A
(Rev.8/8
2)

separate filings. . . .   Not surprisingly, defendant has made no effort to substantiate its claim that the overtime criterion has been met, even in spite of its broader assertion that the fluctuating workweek method is appropriate.  Since contemporaneous payment of overtime compensation is a necessary prerequisite for application of the fluctuating workweek method, as a matter of law defendant has failed to prove that "all the legal prerequisites for use of the 'fluctuating workweek' method of overtime payment are present."  29 C.F.R. § 778.114(c).  *See Griffin*, 142 F.3d at 715, 717-18 (approving use of fluctuating workweek method because employees were "paid an overtime premium of one-half their regular hourly rate for hours worked in excess of forty per week").  *See also Roy v. County of Lexington*, 141 F.3d 533, 547 (4th Cir. 1998) (same); [*Condo v. Sysco Corp.*, 1 F.3d 599, 600 (7th Cir. 1993)] (same); *Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644, 647-48 (6th Cir. 1986) (same).  *Cf. Mayhew v. Wells*, 125 F.3d 216, 219 (4th Cir. 1997) (approving use of method where employees received additional compensation in the form of compensatory time off).

Defendant attempts to avoid this conclusion by suggesting implicitly that the overtime payment criterion is satisfied if overtime is awarded as a remedial measure. In other words, it argues that even if no overtime was paid contemporaneous to the disputed events, the fluctuating workweek method can still be used, as a matter of law, so long as overtime is paid retroactively.  Defendant's interpretation runs counter to the plain meaning of the DOL regulations.  Specifically, 29 C.F.R. § 778.114 makes clear that the fluctuating workweek method can be used only if the employee "receives extra compensation, in addition to [the fixed] salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay."  29 C.F.R. § 778.114(a). This provision contains no suggestion that such compensation need only be paid as part of a judicially crafted remedy, but rather establishes that it is a necessary precondition to application of the fluctuating workweek method.

31

*Rainey*, 26 F. Supp. 2d at 100-01; *see also Cowan v. Treetop Enterprises*, 163 F. Supp. 2d 930, 941 (M.D. Tenn. 2001) (for an employer to avail itself of the fluctuating workweek provision of 29 C.F.R. § 778.114, it must make a contemporaneous payment of the half-time premium) (citing *Rainey*).

The *Rainey* Court also noted that the defendant in that case had maintained consistently that plaintiff was an exempt employee not entitled to any overtime. "If plaintiff were in fact exempt, she clearly would not have been entitled to any overtime compensation, no matter how computed, as the provisions for overtime compensation apply only to employees not exempt from § 207(a).  Yet defendant insists that all along it had a clear mutual understanding with plaintiff, one defined by the regulations as encompassing an understanding that overtime premiums would be paid. . . .  Defendant cannot credibly argue both sides of the same coin."  *Id.* at 102.  Thus, the court concluded, "if the parties had originally agreed that plaintiff's compensation would be governed by the fluctuating workweek method, then defendant would have had to have conceded from the start that plaintiff was covered by § 207(a).  This defendant clearly has not done."  *Id.*

In the present case, like *Rainey*, there was no evidence that satisfied the fourth prong of the fluctuating workweek test - - that Defendants were paying Plaintiff the half-

32

time rate for hours worked over 40 hours.  In fact, just like *Rainey*, Defendants contested throughout the trial that Plaintiff was not entitled to any overtime due to her exempt status.

The Court finds the analysis in *Rainey* to be the appropriate guidepost in this case, rather than the authorities cited by Defendants.  Neither *Yadav* or *Zoltek* actually discussed the issue the Court finds central in this case - - can an employer claim the benefit of the fluctuating workweek after contending that the employee was exempt from the FLSA overtime requirements.  Instead, both of those decisions appear to only address the proper measure of relief.

Under the fluctuating workweek method, while the employee gets paid for hours she might not have worked, the employer receives relief from the onerous burden of paying time-and-a half.  However, the employer actually has to pay the overtime benefit. Since that did not occur in this case, the fluctuating workweek does not apply.

d.    *Individual liability*

The parties did not dispute at trial that if an FLSA violation occurred, Lester was personally liable along with OTS.  In any event, the evidence undisputedly demonstrates that Lester qualifies as an "employer" under the FLSA.

33

*e.     Calculation of damages*

Accordingly, at time-and-a half on the computed hourly salary of $25.96 (salary of $1,384.62 every two weeks, divided by 80 hours = $17.31 per hour multiplied by 1.5), Plaintiff earned $1,890.93 in overtime for the period during which Defendant has no records of her hours.   The overtime earned but not paid during pay periods November 11, 2001, through March 3, 2002, equals $3,435.81.   Therefore, the total overtime due Plaintiff is $5,326.74.

*f.     Good faith and liquidated damages*

The Court concludes that Defendants are not entitled to a finding that they acted in good faith, and, thus, the liquidated damages provisions of the FLSA apply.   The Court finds that Lester's credibility was sorely lacking on his efforts to comply in good faith with the law, primarily, but not exclusively, due to his backdating of the job description in an effort to avoid Plaintiff from being considered non-exempt.   This act confirmed Cason's testimony that Lester stated the overtime was "killing" him.   To the Court, his efforts were an attempt to cover his tracks after Plaintiff complained and Casson advised him that Plaintiff was not exempt.

Accordingly, the Court **FINDS** in favor of Plaintiff and against Defendants jointly and severally on Plaintiff's claim for overtime under the FLSA in the amount of

AO 72A
(Rev.8/8
2)

$5,326.74, and liquidated damages in the amount of $5,326.74.   The Clerk is **DIRECTED** to enter judgment for Plaintiff against Defendants jointly and severally in the amount of $10,653.48.

  **IT IS SO ORDERED AND DIRECTED,** this the 31st day of March, 2006.


      *S/ Alan J. Baverman*

–

      **ALAN J. BAVERMAN**
      **UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)